1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN THE COUNTY OF KING

| | |
|---|---|
| HARJOT BAJWA, on his own behalf and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL AUTOMOTIVE PARTS ASSOCIATION, LLC,<br><br>Defendant. | Case No.: _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Harjot Bajwa, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant National Automotive Parts Association, LLC, ("NAPA") as follows:

## I.    INTRODUCTION

1.      In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.      Among other things, CEMA prohibits transmitting a commercial email with "false or misleading information in the subject line" to the email address of a Washington resident. RCW

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

19.190.020(1)(b).

3.      Defendant NAPA engages in the precise activity which CEMA prohibits.

4.      NAPA spams Washington consumers, including Plaintiff, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5.      This false urgency wastes consumers' time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act—*i.e. purchase*—is short.

6.      And through this deceptive time-sensitivity, NAPA falsely narrows the field—steering consumers away from shopping for better deals—to its own products and services which must be purchased *now*.

7.      Plaintiff challenges the defendant's harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.      JURISDICTION AND VENUE

8.      The Court has jurisdiction of this case under RCW 2.08.010.

9.      Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

## III.      PARTIES

10.     Plaintiff Harjot Bajwa is a resident of King County, Washington.

11.     Defendant National Automotive Parts Association, LLC, is a Georgia limited liability company with its principal address at 2999 Wildwood Parkway, Atlanta, GA 30339.

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

## IV.    FACTUAL ALLEGATIONS

### A.    CEMA protects Washington consumers from deceptive spam emails.

12.    The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

13.    In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

14.    While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

15.    The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

16.    In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

17.    In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

18.    Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

19.    Consumers therefore routinely "consent" to receive flurries of commercial emails

CLASS ACTION COMPLAINT – 3

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

which they did not meaningfully request and in which they have no genuine interest.

20.    This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

21.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22.    The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

23.    CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

24.    CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

25.    CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

26.    CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that

CLASS ACTION COMPLAINT – 4

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

27.    CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

28.    The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B.    The subject lines of NAPA's marketing emails make false time scarcity claims.**

29.    One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

30.    The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra* para. 29, at 22.

31.    "False or misleading scarcity claims can change the behaviour of consumers." *Online Choice Architecture, supra* para. 29, at 27.

32.    Representations about the timing and duration of sales, discounts, and other special

CLASS ACTION COMPLAINT – 5

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

33.     False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

34.     Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

35.     Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

36.     False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

37.     Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

38.     False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

39.     These false time scarcity claims are a staple of the defendant's email scheme to compel consumers to purchase its products.

40.     **Urgent Spam Emails.** NAPA is practiced in this trick of luring in consumers

CLASS ACTION COMPLAINT – 6

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263.1109
straussborrelli.com

1  through urgent subject headings in emails that do not reflect the true availability of the deal itself,

2  as the examples below demonstrate.

3      41.    NAPA regularly uses false time scarcity claims to entice consumers to purchase

4  their products. Emails advertising holiday promotions serve as an example.

5      42.    On November 12, 2024, NAPA sent an email titled, "LAST CALL: Unlock Your

6  20% Off!" The email's text advertised "Veterans Day Savings" and provided a promotional code

7  that consumers could enter to receive 20% off online orders totaling $125 and up.

8      43.    November 12 was not the last call for the 20% off offer.

9      44.    Two days later, on November 14, 2024, NAPA transmitted an email with the

10  headline: "Save Up To 20% for National Recycling Week[.]" Again, the message offered 20% off

11  for consumers spending $125 or more on the defendant's website.

12      45.    Indeed, NAPA simply recycled the 20% off deal, as well as the deceptive strategy

13  powering it. The urgent warning transmitted in the November 12 subject line needlessly pressured

14  consumers to act. The opportunity would return.

15      46.    Later that same month, in a November 29, 2024, email, NAPA pressured consumers

16  to act fast using the headline: "Final Hours for Black Friday Savings! 🔴 [.]" Within the message,

17  recipients were again offered up to 20% off using a coupon code.

18      47.    Upon information and belief, time pressures such as those deployed by NAPA are

19  even more effective in the latter months of the year when consumer spending is at its highest and

20  the holidays are fast approaching.

21      48.    The very next day, after warning consumers that Black Friday savings would end

22  in hours, NAPA confirmed the falsity of its November 29 message. On November 30, 2024, with

23  the headline, "EXTENDED: Our Best Black Friday Deals[,]" NAPA changed the deadline on the

24

25  CLASS ACTION COMPLAINT – 7

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

promotion. The body of the email confirmed that the same coupon code was still in effect.

49.     Consumers in receipt of the November 29, 2024, email were not at risk of missing the deal, had they ignored the subject line, because NAPA did not end the promotion on November 29. The false conclusion of the Black Friday offer was simply a marketing strategy meant to compel consumers to purchase the defendant's products.

50.     Within days, NAPA was revving up for more seasonally themed deception.

51.     On December 2, 2024, NAPA warned consumers about the impending close of its Cyber Monday promotion in an email titled: "Last Chance: Cyber Monday Discounts 🕐 [.]" The preview text accompanying the deceptive subject line notes that the offer is for NAPA Auto Accessories, while the message itself provides a coupon code for "[u]p to 20% off[.]"

52.     One day later, on December 3, 2024, NAPA transmitted another email with the subject line: "EXTENDED: Our Biggest Sale Of The Year[.]" Again, the email's preview text notes that the offer concerns NAPA Auto Accessories while the message provides a coupon code for "[u]p to 20% off[.]"

53.     The December 3 email confirms the falsity of the December 2, 2024, subject line. Despite the contrived time scarcity, consumers had additional time during which they could accept the defendant's offer.

54.     NAPA continued to pair false deadlines with surprise extensions in 2025.

55.     On July 2, 2025, NAPA sent consumers an email with the title: "Limited Time Offers For July 4th! ⏳ [.]" An hourglass emoji sent in the subject line further emphasized that the promotion was time sensitive, while the body of the email included a code that could be redeemed for up to 20% off items on the NAPA website.

56.     Yet, the 4th of July Sale would endure beyond the holiday.

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

57.    On July 5, 2025, NAPA transmitted an email with the heading: "Extended Discounts for the Holiday Weekend!" Again, the same code sent in the July 2 email was provided within the message.

58.    The defendant deployed the same model of deception just last month.

59.    On September 1, 2025, NAPA sent an email cautioning consumers about the end of its Labor Day promotion with the subject line: "[Recipient's name], Final Hours to Save Big This Labor Day!" A coupon code for up to 20% off orders totaling $125 or more is provided within the message.

60.    However, the claim made in the email's subject line was untrue.

61.    On September 2, 2025, NAPA proved as much with an email titled: "Extended 48 hours! Don't miss out 🕐 [.]"

62.    Thus, despite the defendant's September 1 representation that its Labor Day Sale would conclude within hours, consumers still had days to act on the promotion.

63.    NAPA deploys its deceptive strategy for 20% off promotions as well.

64.    NAPA sent consumers an email on April 28, 2023, urging quick action with the subject line: "20% Savings Ends Sunday[.]" The message provided a promotional code for 20% off online purchases of three items.

65.    Unfortunately for consumers, the April 28 message was but a mere pitstop along the defendant's oft-traveled road of deceit.

66.    It wouldn't take long for NAPA to demonstrate the falsity of the email's subject line because, by May 19, 2023, NAPA had reignited the deal. An email sent on that date and titled, "Save 20% This Weekend Only[,]" yet again ratcheted up the time pressure exerted against consumers. Save for a new deadline, the terms of the deal mirror those found in the April 28 offer.

CLASS ACTION COMPLAINT – 9

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

67.     However, with NAPA at the wheel, the buy 3, save 20% promotion was bound to see heavy mileage. The defendant would quickly spam consumers with the offer yet again, simultaneously proving the falsity of the May 19 subject line.

68.     Despite consistently suggesting that the discount was a special offer and that consumers who passed on it were at risk of losing out, NAPA advertised a buy 3, save 20% offer again on June 2, 2023, in an email titled, "Buy 3 to Save BIG!" However, this time, consumers would have until June 30, 2023, to accept the offer.

69.     Thus, the time limits and endings warned of in April and May were false. Those warnings are simply repeat examples of the defendant's deceptive strategy: manufacturing false pressure meant to drive consumers to its website and, ultimately, the checkout screen.

70.     Later the same year, NAPA would rev up its misleading marketing campaign yet again. This time, the vehicle for deception would be a promotion encouraging consumers to spend $120 or more on the defendant's website.

71.     On August 9, 2023, NAPA sent consumers an email warning them of an allegedly time-limited offer. The email's subject line cautioned: "4 days only!" The contents of the message further explained the deal, providing a promotional code that would give consumers 20% off their online order totaling $120 or more. According to text within the email, the offer would end on Saturday, August 12, 2023.

72.     NAPA, however, would only briefly pump the brakes on the promotion.

73.     Within mere days, the defendant was back in consumer inboxes to announce the same offer in an August 16, 2023, email titled: "Save 20% instantly[.]" The body of the email provided terms that were identical to the August 9 email, save for the end date which was changed to August 19.

CLASS ACTION COMPLAINT – 10

74.     Thus, the caution sent on August 9, 2023, was completely contrived. Within days, consumers would have access to the same deal once again.

75.     Despite the scarcity touted in its subject lines, NAPA would continue to make intermittent 20% off offers, often wrapping them in urgency.

76.     On March 5, 2024, NAPA transmitted an email with the subject line: "Last Chance[.]" This time, as confirmed by the text of the email, consumers were required to spend $125 at NAPA's website to receive 20% off their purchase. The message also stated that deal would end on March 5.

77.     True to form, NAPA quickly revived the offer.

78.     Consumers were again invited to take 20% off orders of $125 and up in a March 13, 2024, email titled: "Celebrate the Saving o' the Green[.]" The message explained that the offer would continue until March 18, thereby disproving the March 5, 2024, subject line.

79.     In fact, March 5 was anything but consumers' "last chance" to accept the offer. Consumers would have multiple opportunities to get the 20% off deal, as provided in the following emails, all of which advertise the offer:

    a.  April 2, 2024: "Save 20% Instantly"

    b.  April 15, 2024: "Money You Don't Have to Claim on Your W2"

    c.  April 20, 2024: "Spring into Action and Save"

    d.  May 3, 2024: "[Recipient's name], Looking to Save Big?"

    e.  May 11, 2024: "Happy Mother's Day from NAPA"

    f.  May 16, 2024: "Shop NAPA Online and Save"

    g.  June 4, 2024: "There's No Time to Waste"

80.     As the repeat opportunities demonstrate, there was nothing scarce about the 20%

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

off orders of $125 or more offer. NAPA simply manufactured false time pressure to influence consumers and drive their buying decisions.

81.    A similar example occurred on June 29, 2024, when NAPA sent an email with the heading: "[Recipient's name], Special Savings Ends Tomorrow[.]" The details of the offer are provided within the message which gives a promotional code that consumers may enter on NAPA's website and save 20% off on orders totaling $150 and up.

82.    Despite NAPA's claim that the chance for special savings was coming to an end, consumers would soon have another chance for 20% off.

83.    On July 10, 2024, NAPA sent an email with the subject line: "Our Hottest Savings of the Summer[.]" Within the email, consumers were again offered 20% off their online purchase. However, this time, the required spend amount was lower. Consumers could obtain the 20% off offer by spending $125 or more.

84.    So, consumers who ignored NAPA's June 29 warning were, in effect, better off having done so. Pursuant to the July 10 email, consumers could still obtain the 20% rate but could do so without spending as much money. This fact aptly demonstrates the harm that consumers may experience when retailers torque the truth. The false time scarcity leveraged by NAPA might compel a buyer who is shopping for a certain product in late June to buy a more expensive brand or additional items simply so they can reach the $150 threshold and qualify for the 20% offer. Were that buyer not deceived into thinking that the 20% off deal was a rarity, they might have researched other options or, at the very least, waited until early July when they could spend less to get the same discount.

85.    Consistent with its typical pattern, NAPA would continue to revive the promotion, repacking it and spamming it right back into consumer's inboxes.

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

86.     On August 12, 2024, NAPA sent consumers an email titled: "LIMITED TIME: Take 20% Off Orders of $125+[.]" Inside the message, NAPA presented the promotion as "Back to School Savings" and noted that the offer would end on August 15.

87.     While the August 12 subject line stated that the 20% off offer was subject to time limits, NAPA quickly transmitted the offer again under a new pretense.

88.     This time, NAPA packaged the promotion as a Labor Day sale in an August 29, 2024, email with the subject line: "Our Labor Day Sale Starts Now[.]" The email confirms that the offer is for 20% off online purchases of $125 or more.

89.     Despite NAPA's misleading subject line on August 12, 2024, the "limited time" offer would be available well into the future.

90.     As these subject lines demonstrate, NAPA employs a strategy where it pressures consumers to purchase its products by falsely representing the limited availability of its offers; offers that are repackaged, repeated, and redeployed.

91.     Emails advertising a 2023 rebate provide another example of the deceit inherent in NAPA's spam campaigns.

92.     On January 30, 2023, NAPA sent a message warning recipients that time was running out on a battery rebate promotion. The email was titled: "Last chance to get a $25 rebate on a new AAA battery[.]" Text within the message advised that the offer would end the following day.

93.     Despite the time scarcity claim that NAPA drove into consumers' inboxes, the battery promotion was far from dead.

94.     By early February, NAPA had jumpstarted the offer once more as confirmed by a February 11, 2023, email with the subject line: "Is your car battery about to die?" The message

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

itself offered a $25 mail-in rebate with purchase of a new AAA battery. However, this time, consumers would have until the end of the month to act on the deal.

95.     The February 11, 2023, email demonstrated that the January 30 subject line was false. Not only would consumers have another chance to participate in the promotion; the February 11 email gave recipients most of the following month to accept the rebate offer.

96.     Upon information and belief, false scarcity claims such as this are likely to influence the behavior of consumers. An individual with limited funds and in need of a battery to ensure reliable travel to work would be exceptionally vulnerable to this kind of deceit. Believing that NAPA's January 30 subject line was truthful and that it was indeed the last chance to purchase a battery so affordably, such an individual is likely to forego additional research and potentially better deals so they can act quickly on the purportedly scarce offer. Simply put, lies of this sort have very real costs for many consumers.

97.     As these subject lines demonstrate, NAPA engages in an email marketing strategy whereby it creates a false sense of urgency, misrepresents when sales end, and then strategically extends or revives those sales to pull in consumers with subject headings misrepresenting the availability of deals.

98.     These and other examples of the commercial emails that NAPA has sent consumers containing subject lines with false or misleading statements are attached to this Class Action Complaint as Exhibit A.

**C.     NAPA knows when it sends emails to Washington residents.**

99.     A sophisticated commercial enterprise, like NAPA, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

its knowledge.

100.    First, the sheer volume of email marketing that NAPA engages in put it on notice that Washington residents would receive its emails.

101.    Second, NAPA may obtain location information tied to email addresses when consumers make purchases from NAPA through digital platforms, including the NAPA website, or otherwise self-report such information to NAPA.

102.    Third, NAPA may obtain location information tied to email addresses by tracking the IP addresses of devices used to open its emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

103.    Specifically, NAPA likely uses Klaviyo to manage its email marketing campaigns. This platform should allow NAPA to access a list of every email address that was sent a marketing email. It should also allow NAPA to determine who viewed each email and who clicked on any links within them.

104.    NAPA is likely able to infer the general geographic location of recipients by state based on their IP address at the time of email open or link click.

105.    Fourth, NAPA may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

106.    Fifth, NAPA may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

107.    Sixth, NAPA may obtain information that the recipients of its marketing emails are

CLASS ACTION COMPLAINT – 15

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

108.    It is thus highly probable that a seller with the size and sophistication of NAPA employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**D.    NAPA violated Plaintiff's right under CEMA to be free from deceptive commercial emails.**

109.    NAPA has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

110.    Plaintiff received the June 29, 2024, email titled: "[Recipient's name], Special Savings Ends Tomorrow[.]"

111.    This email was false or misleading in violation of CEMA, for misrepresenting the timing of the deals, as described herein.

112.    The email contained false statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

113.    Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

114.    Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

115.    The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

116.    Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

117.    The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

118.    There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

119.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

120.    Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

marketing; have no interest adverse to the Class; and have retained competent counsel extensively experienced in consumer protection and class action litigation.

121.    Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

122.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

123.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

124.    Plaintiff incorporates and realleges paragraphs 1–112 above.

125.    CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by

CLASS ACTION COMPLAINT – 18

a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

126.    Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

127.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

128.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents as such "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW 19.190.020(b)(2).

129.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

130.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

## Second Claim to Relief

### Violation of the Consumer Protection Act, RCW 19.86.020

131.    Plaintiff incorporates and realleges paragraphs 1–112 above.

132.    The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

CLASS ACTION COMPLAINT – 19

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

133.   A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

134.   A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

135.   CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

136.   Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

137.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

138.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

139.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

140.   For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.   JURY DEMAND

141.   Plaintiff will demand a jury trial by separate document in accordance with Local

CLASS ACTION COMPLAINT – 20

Civil Rule 38(b).

## VIII.   PRAYER FOR RELIEF

Plaintiff asks that the Court:

A.     Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.     Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.     Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.     Award Plaintiff's costs of suit, including reasonable attorneys' fees; and

E.     Order such further relief the Court finds appropriate.


*[Counsel signature block to follow on next page.]*

**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ● FAX 872.263.1109
straussborrelli.com

DATE: October 13, 2025

Respectfully submitted,

/s/ Samuel J. Strauss

Samuel J. Strauss, WSBA No. # 46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

*Attorneys for Plaintiff*

* Applications for admission *pro hac vice* forthcoming

CLASS ACTION COMPLAINT – 22

— **EXHIBIT  A** —

1

2

3

4

5

6

7          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
               IN THE COUNTY OF KING

8  HARJOT BAJWA, on his own behalf and on      Case No.: _____
   behalf of others similarly situated,

9                                              CLASS ACTION COMPLAINT
                    Plaintiff,
10                                             EXHIBIT A

        vs.
11

12 NATIONAL AUTOMOTIVE PARTS
   ASSOCIATION, LLC,
13
                    Defendant.

14

| Date | Subject Line |
|------|-------------|
| 1/30/23 | Last chance to get a $25 rebate on a new AAA battery |
| 4/28/23 | 20% Savings Ends Sunday |
| 5/19/23 | Save 20% This Weekend Only |
| 8/9/23 | 4 days only! |
| 3/5/24 | Last Chance |
| 6/29/24 | [Recipient's name], Special Savings Ends Tomorrow |
| 8/12/24 | LIMITED TIME: Take 20% Off Orders of $125+ |
| 11/12/24 | LAST CALL: Unlock Your 20% Off! |
| 11/29/24 | Final Hours for Black Friday Savings! ⏰ |
| 12/2/24 | Last Chance: Cyber Monday Discounts 🕐 |
| 7/2/25 | Limited Time Offers For July 4th! ⌛ |
| 9/1/25 | [Recipient's name], Final Hours to Save Big This Labor Day! |

24

25  CLASS ACTION COMPLAINT
    EXHIBIT A – 1